UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 06-22781-CIV-COOKE/BROWN

ROBERT B. HARMAN,

      Plaintiff,

v.

ADJOINED CONSULTING, LLC.,

      Defendant.

_____/

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant's Motion to Dismiss (DE 15), filed

January 29, 2007.  The Court having reviewed the Motion finds, for the reasons set forth below,

that it should be denied in part and granted in part.

### I.    BACKGROUND

Plaintiff Robert B. Harman ("Harman" ) instituted this action on November 13, 2006.

This matter involves several written and/or oral contracts allegedly entered into between the

Parties regarding consulting services allegedly provided by Harman.  In his Amended Complaint,

Harman alleges that on May 30, 2003 he entered into the First Independent Consulting

Agreement (the "First Consulting Agreement") with Adjoined Consulting, Inc ("Adjoined").

According to Harman, the First Consulting Agreement was set to run for a period of ten years.

Harman alleges that under the First Consulting Agreement Adjoined was required to pay him

$36,000 per month for each month that he provided consulting services to Adjoined.  Harman,

-1-

however, contends that the First Consulting Agreement was terminated by a Letter Agreement and Release dated January 26, 2004 (the "Letter Agreement").  Harman avers that under the terms of the Letter Agreement he agreed to the cancellation of the First Consulting Agreement, effective January 30, 2004, in exchange for an unconditional payment of $72,000 and for Kanbay International, Inc.'s ("Kanbay") agreement to enter into a Second Consulting and Sales Agreement (the "Second Consulting Agreement").[1]  Harman alleges that the payments outlined under the Letter Agreement were intended to serve as consideration for his signing the Letter Agreement.  Moreover, Harman avers that he was not required to perform any consulting services for Adjoined in order to receive the payments allegedly due under the Letter Agreement.

The Second Consulting Agreement allegedly became effective on April 1, 2004.  Harman avers that under the Second Consulting Agreement, he was entitled to receive 5% of all sales in which he either generated the lead or materially participated in the sales process.  Harman also alleges that under the Second Consulting Agreement he was entitled to options to purchase 15,000 shares of Adjoined's common stock for each $750,000 of sales where he either generated the lead or materially participated in the sales process.  Notably, Harman contends that from February 2004 to March of 2004 there was no formal written consulting agreement in effect. Harman, however, alleges that Adjoined orally engaged his consulting services during the February 2004 to March 2004 time period.  Specifically, Harman alleges that Adjoined

---

[1]On May 3, 2007, the Parties' filed an agreed motion to substitute Adjoined Consulting, LLC for Kanbay International, Inc.  In that motion, the Parties stipulated that Adjoined Consulting, LLC and Kanbay International, Inc. merged and as a result Adjoined Consulting, LLC became the successor to Kanbay International, Inc.  The Court granted the motion to substitute Adjoined Consulting, LLC for Kanbay International, Inc on May 7, 2007.  Therefore, Adjoined Consulting, LLC is the sole Defendant in this action.

represented to him and led him to believe that if he provided consulting services during the February 2004 to March 2004 period then Adjoined would compensate him on the same basis as set forth under the Second Consulting Agreement.  According to Harman, Adjoined retained him, during the February 2004 to March 2004 period, to obtain business from Citibank.  In this regard, Harman allegedly introduced Mark Piro of Adjoined to Harvey Koeppel and other Citibank operatives.  Moreover, Harman alleges that he personally conducted meetings to discuss Adjoined providing its consulting services to Citibank.  These meetings allegedly occurred before and after April 1, 2004 — the date the Second Consulting Agreement became effective.

Harman further alleges that in June of 2006 he learned that Adjoined had done substantial work for Citibank and was continuing to provide services to Citibank.  Harman avers that Ajoined gained the opportunity to provide services to Citibank as a result of his efforts.  Harman alleges that after he learned of the Adjoined-Citibank service engagement he contacted Adjoined to seek compensation for allegedly generating the Citibank lead.  However, according to Harman, Adjoined informed him that it was not required to pay him for his alleged services because he had already been compensated under the Letter Agreement.  Harman contends that to date Adjoined has failed to properly compensate him for his alleged services related to the Adjoined/Kanbay-Citibank engagement.

Harman asserts the following causes of action: (1) breach of contract; (2) fraud and deceit; and (3) unjust enrichment.  Additionally, Harman requests that the Court award him: 5% of all fees collected by Adjoined and Kanbay from Citibank, a proportionate number of stock options allegedly due under the Second Consulting Agreement, and punitive damages for the alleged fraud and deceit.

## II.   PROCEDURAL HISTORY

Adjoined filed its Motion to Dismiss on January 29, 2007.  Harman filed his opposition on February 20, 2007.  Adjoined filed its reply brief on March 9, 2007.  Thus, Adjoined's Motion to Dismiss is ripe for adjudication.

## III.   MOTION TO DISMISS STANDARD

"[W]hen considering a motion to dismiss, the court must accept all allegations of fact as true and should only dismiss when it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proven in support of his claim."  Solis-Ramirez v. U.S. Dept. of Justice, 758 F.2d 1426, 1429 (11th Cir. 1985) (citing Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 65-66 (1978)).  See Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir. 1993).  Thus, "the court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir.1993).  However, "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.  To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957) (citing Fed.R.Civ.P. 8(a)(2)).

## IV.   ANALYSIS

In its Motion, Adjoined asserts the following arguments: 1) Harman's claim for breach of the Second Consulting Agreement must be dismissed because the Second Consulting Agreement does not pertain to any alleged sales activities occurring prior to April 1, 2004 (the effective date

of the Second Consulting Agreement); 2) the Economic Loss Rule bars Plaintiff's claims for fraud and deceit; 3) the January 26, 2004 Letter Agreement contains a binding integration clause which bars Harman's claims concerning an oral agreement; 4) Harman's claim for unjust enrichment is inappropriate because a valid contract exists; and 5) Harman failed to plead his fraud claim with particularity.  The Court shall address each of these arguments below.

### A.   HARMAN'S BREACH OF CONTRACT CLAIM WILL NOT BE DISMISSED

Adjoined contends that Harman's breach of contract claim should be dismissed because "it is clear that the sales lead was generated prior to the April 1, 2004 effective date of the [Second] Agreement."  Mot. at 6.  The Court, however, finds this argument to be unavailing. First, it would be wholly inappropriate for the Court to decide — on a motion to dismiss — when the sales lead in question was generated.  Adjoined is reminded that when considering a motion to dismiss the Court must "accept all allegations of fact as true and should only dismiss when it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proven in support of his claim."  Solis-Ramirez, 758 F.2d at 1429 (11th Cir. 1985) (citations omitted).  Accordingly, the Court is not in a position to evaluate the factual allegations of the Complaint.  Moreover, in his Complaint when alleging that he generated the lead for the Adjoined-Citibank engagement Harman stated the following:

> Between January 30, 2004 and April 1, 2004, Harman introduced Mark Piro, then Adjoined's Managing Director, to Harvey Koeppel and others at Citibank. Harman personally conducted meetings with them to discuss Adjoined providing its consulting services to Citibank.  Some of the meetings occurred before April 1, 2004, and some of the meetings occurred after April 1, 2004.

Amended Compl. at ¶ 13.  Thus, Harman explicitly alleged that some of the meetings with regard

to the Citibank engagement occurred before and *after* April 1, 2004 (the effective date of the

Second Consulting Agreement).   Nevertheless, Adjoined attempts to sidestep this allegation

through convoluted circular argumentation.   First, Adjoined places undue significance on the fact

that the original complaint did not contain allegations that the alleged meetings occurred before

*and* after April 1, 2004.   However, the contents of the original complaint are of no import as the

Amended Complaint is the operative pleading in this case.   Fritz v. Standard Sec. Life Inc. Co. of

New York, 676 F.2d 1356, 1358 (11th Cir. 1982)("Under the Federal Rules, an amended

complaint supersedes the original complaint")(citations omitted).   Next, Adjoined argues that

Harman failed to allege that he materially participated in the sales process with regard to the

Citibank engagement.   Additionally, Adjoined argues that Harman's "mere attendance at

meetings with Citibank . . . [is not] synonmous with a 'material participation in the sales

process.'"  Mot. at 4.   But this argument appears to befuddle and misconstrue the terms of the

Second Consulting Agreement.[2]   In relevant part, the Second Consulting Agreement states "[t]he

following commission schedule will apply to Consultant's sales efforts: five percent 5% for all

Sales (as later defined).   For each $750,000 in Sales, you shall receive options to purchase 15,000

shares of Adjoined Consulting common stock.   Sales means that you generate the lead that led to

the sale or materially participated in the sale process."  Ex. 1.   Thus, it appears that under the

terms of the Second Consulting Agreement Harman is entitled to compensation for a sale if he

generated the lead that led to the sale *or* materially participated in the sale process.   Therefore,

---

[2]The First Consulting Agreement, Second Consulting Agreement, and Letter Agreement
were each attached as exhibits to the Complaint.  See Compl. Exhibits 1, 2, and 3.  Therefore, the
Court may review the terms of the agreements without risk of converting Adjoined's Motion to
Dismiss into a motion for summary judgment.  See Day v. Taylor, 400 F.3d 1272, 1276 (11th
Cir. 2005); Fed.R.Civ.P. 12(b).

Adjoined's argument that Harman did not materially participate in the sales process appears to miss the mark as Harman would be entitled to compensation based solely upon his generation of a lead — regardless of whether he materially participated in the sale process. Additionally, even if Adjoined's argument was meritorious it would be inappropriate for the Court to evaluate — on a motion to dismiss — the nature of Harman's participation in the alleged meetings with Citibank and whether that alleged participation constituted material participation in the sales process. See Solis-Ramirez, 758 F.2d at 1429 (11th Cir. 1985) (citations omitted). Finally, Adjoined appears to argue that the alleged lead in question was generated when Harman allegedly introduced Mark Piro (of Adjoined) to Harvey Koeppel (of Citibank) prior to April 1, 2004. This argument, however, is unavailing and premature at the motion to dismiss stage. While it may be the case that a lead can be generated simply through one introductory meeting it also feasible that the generation of a lead requires more than one simple introductory meeting. Moreover, given Harman's allegations that he participated in meetings before and after April 1, 2004 there is no basis for the Court to determine when exactly the lead was generated as this is a question of fact which a jury must evaluate. Therefore, Harman's claim for breach of the Second Consulting Agreement will not be dismissed.

### B. THE COURT WILL NOT DISMISS HARMAN'S FRAUD AND DECEIT CLAIMS BASED UPON THE ECONOMIC LOSS RULE

In its Motion, Adjoined argues that the economic loss rule bars Harman's fraud and deceit claim. "The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." Indemnity Insur. Co. of North America v. American Aviation, Inc., 891 So.2d 532, 536 (Fla.

2004).  In Florida, the economic loss doctrine bars recovery of economic losses, through tort

actions, for matters arising from a contract.  See id.  In explaining the rationale behind the rule,

the Florida Supreme Court stated:

> "Underlying this rule is the assumption that the parties to a contract have allocated
> the economic risks of nonperformance through the bargaining process. A party to
> a contract who attempts to circumvent the contractual agreement by making a
> claim for economic loss in tort is, in effect, seeking to obtain a better bargain than
> originally made.  Thus, when the parties are in privity, contract principles are
> generally more appropriate for determining remedies for consequential damages
> that the parties have, or could have, addressed through their contractual
> agreement."

Id. at 536-37.  Specifically, the economic loss rule provides that contract principles are more

appropriate than tort principles for resolving economic losses without accompanying physical

injury to property other than that which is the subject of the contract.  Behrman v. Allstate Ins.

Co., 388 F.Supp.2d 1346, 1349 n.4 (S.D. Fla. 2005) citations omitted).  Thus, "[w]here the facts

surrounding a breach of contract action are indistinguishable from an alleged tort, and where the

alleged tort does not cause harm distinct from that caused by the breach of contract, a plaintiff is

barred from bringing a separate tort action."  Id. (citing Eye Care Int'l Inc. v. Underhill, 92

F.Supp.2d 1310, 1315 (M.D.Fla.2000)).

However, the economic loss rule does not bar all tort actions where there is privity of

contract between the parties.  In HTP, Ltd., v. Lineas Aeras Costarricenses, S.A., 685 So.2d

1238, 1239 (Fla. 1996) the Florida Supreme Court stated "[w]here a contract exists, a tort action

will lie for either intentional or negligent acts considered to be independent from the acts that

breached the contract."  See e.g. Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc., 842 So.2d 204,

209 (Fla. Dist. Ct. App. 2003) (holding that the economic loss rule did not bar plaintiff's fraud

and misrepresentation claims because those claims were distinct and independent from the

contractual relationships between the parties).  Nevertheless, the Court must stress that this is

only the case where the plaintiff can show that the tort claims are extraneous to the breach of

contract.  See Medalie v. FSC Securities Corp., 87 F.Supp.2d 1295, 1305 (S.D.Fla.2000)).

In his opposition, Harman argues that there was no governing written contract at the time

that his fraud and deceit claims arose, thereby, making the economic loss rule inapplicable to

those claims.  With regard to his fraud and deceit claims Harman asserted the following

allegations:

> Adjoined/Kanbay made misrepresentations or omissions in January 2004,
> including, but not limited to . . . that the $72,000 payment made by Adjoined to
> Harman was in consideration for executing the [Letter Agreement] canceling the
> First Consulting Agreement and for providing a release of claims; that for
> providing introductions and obtaining sales for Adjoined that occurred after
> January 1, 2004 but before April 1, 2004 Adjoined would compensate Harman;
> that Harman would be compensated for leads made and sales made during the gap
> period consistent with the terms of compensation set forth in the [Second
> Consulting Agreement] . . . Harman justifiably relied upon the representations and
> omissions of Adjoined/Kanbay in agreeing to execute the [Letter Agreement] . . .
> Harman also justifiably relied upon the representations of Adjoined/Kanbay in
> agreeing to introduce Piro to Citibank.

Amended Compl. at ¶¶ 23-25.  Thus, these claims appear to relate to the period from March 2004

to February 2004 — the time period in which Harman alleges that the Parties did not have a

written agreement governing their alleged relationship.  Notably, these allegations do not appear

to concern or relate to Harman's claim for breach of the Second Consulting Agreement.  In fact,

nowhere in Count II of the Complaint does Harman reference the Second Consulting Agreement

or any transactions which allegedly occurred after April 1, 2004 — the date that the Second

Consulting Agreement became effective.  Nevertheless, Adjoined argues that the Letter

Agreement governed the Parties' relationship from January 26, 2004 until the effective date of

the Second Consulting Agreement — April 1, 2004.  Specifically, Adjoined states "the January

26, 2004 Letter Agreement expressly provides that Harman would receive a 'transition' payment

of $72,000.00 which clearly would encompass all Harman's consulting activities until the April

1, 2004 Consulting & Sales Agreement became effective."  Reply at 7.  Notably, Adjoined failed

to directly quote from any provision of the Letter Agreement which establishes its proposition.

The Court finds Ajoined's lack of direct quotes to be ironic given Adjoined's assertion that the

Letter Agreement "clearly" indicates that the $72,000 transition payment would encompass all of

Harman's consulting activities until April 1, 2004.  It would seem that if the Letter Agreement

encompassed such a "clear" proposition then Adjoined would simply directly quote that

language.  Instead, Adjoined only cited to Paragraphs One and Two of the Letter Agreement.

Those paragraphs, however, do not "clearly" establish Adjoined's proposition.  In their entirety,

Paragraphs One and Two of the Letter Agreement state:

> The Consulting Agreement shall be deemed terminated as of January 30, 2004
> ("Termination Date") . . . Adjoined shall pay you a transition payment in the
> amount of $72, 000, payable in $36,000 installments in February and March; plus,
> in the event that no termination notice has been provided by Adjoined under the
> Sales Agreement (as defined hereafter), you shall receive an additional $36,000
> payment on April 30, 2003.

Ex. 3 at ¶¶ 1-2.  Paragraphs One and Two of the Letter Agreement do not directly state or directly

suggest that the $72,000 payment to Harman was made in consideration for or in contemplation

of any consulting services which Harman was to provide between January 26, 2004 (the date of

the Letter Agreement) and April 1, 2004 (the effective date of the Second Consulting

Agreement).

Furthermore, when reading the agreement as a whole it is feasible that the "transition payment" was intended to solely serve as consideration for Harman's release of Adjoined from its obligations under the First Consulting Agreement.  In relevant part, the Letter Agreement states:

> Adjoined Consulting, Inc. ("Adjoined") has decided that for business reasons it is necessary to terminate that certain Independent Consulting Agreement dated May 30, 2003 (the "Consulting Agreement").  In consideration for you signing this letter agreement ("Agreement"), which among other things contains a release of all claims, Adjoined is willing to pay a transition benefit to you as set forth below. Accordingly, in consideration of the mutual promises and covenants between you and Adjoined, you and Adjoined agree as follows . . . The Consulting Agreement shall be deemed terminated as of January 30, 2004 ("Termination Date") . . . Adjoined shall pay you a transition payment in the amount of $72, 000, payable in $36,000 installments in February and March; plus, in the event no termination notice has been provided by Adjoined under the Sales Agreement (as defined hereafter), you shall receive an additional $36,000 payment on April 30, 2003.

Ex. 3 at 1.  On its face, the Letter Agreement does not explicitly discuss further consulting services to be provided by Harman between January 26, 2004 and April 1, 2004.  The Court recognizes that the term "transition payment" could be construed to mean that the payment was intended to cover the services allegedly provided by Harman between February 2004 and March of 2004.  However, the term is undefined in the Letter Agreement.  Accordingly, the term "transition payment" appears to be susceptible to more than one reasonable interpretation and is therefore ambiguous.  Commercial Capital Resources, LLC v. Giovannetti, 955 So.2d 1151, 1153 (Fla. Dist. Ct. App. 2007) (Where a contract is reasonably or fairly susceptible to different constructions it is ambiguous).  Moreover, because interpretation of ambiguous contracts potentially involves questions of fact dismissal under Rule 12(b)(6) would be inappropriate at this juncture.  Therefore, the Court will not dismiss Harman's fraud and deceit claims under the

economic loss rule as an issue of fact remains as to whether the Letter Agreement even governed the Parties' relationship during the relevant time period (February 2004 to March 2004).[3]

### C.   THE LETTER AGREEMENT'S INTEGRATION CLAUSE MAY NOT BE APPLICABLE

Next, Adjoined contends that the integration clause contained within the Letter Agreement bars Harman's claims for fraud and deceit.  The integration clause in question states "[t]his Agreement constitutes the entire agreement between you and Adjoined with respect to matters set forth herein and supersedes in its entirety any and all agreements or communications, whether written or oral, previously made in connection with the matter herein.  This agreement may not be modified or changed orally.  All modifications or changes must be made in writing and signed by both you and Adjoined."  Ex. 3 at ¶ 10.  However, as previously discussed, it is unclear whether the Letter Agreement governed the Parties' relationship during the relevant time period or simply served to release Adjoined from its obligations under the First Consulting Agreement.  Thus, the applicability of the Letter Agreement's integration clause remains unresolved.  The Court, therefore, is unable to conclude that the integration clause contained within the Letter Agreement precludes Harman's fraud and deceit claims.

### D.   HARMAN'S UNJUST ENRICHMENT CLAIM WILL NOT BE DISMISSED

With regard to Harman's unjust enrichment claim Adjoined argues that the claim should be dismissed because the written Letter Agreement governed the Parties' relationship, thereby,

---

[3]Additionally, the Court notes that Harman's fraud claim appears to be based upon allegations of fraudulent inducement which may survive the economic loss rule as a tort action will lie for either intentional or negligent acts considered to be independent from the acts that breached the contract.  HTP, Ltd., 685 So.2d at 1239.

invalidating any claim for equitable relief.  However, as the Court has previously discussed the applicability of the Letter Agreement remains in question.  Therefore, it would be inappropriate to dismiss Harman's unjust enrichment claim at this juncture.

### E.    HARMAN SHALL AMEND HIS FRAUD CLAIMS

Finally, Adjoined argues that Harman's fraud claims were not alleged with sufficient particularity.  Pursuant to Federal Rule of Civil Procedure 9(b) "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).  "This Rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior. "  Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1370-71 (11th Cir. 1997) (citations omitted).  Rule 9(b) may be satisfied if the complaint sets forth: (1) precisely what statements were made in what documents or oral representations or what omissions were made; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making certain statements); (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud.  Id. at 1371. "However, alternative means are also available to satisfy the rule."  Id.  Finally, Rule 9(b) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires a plaintiff to plead only a short, plain statement of the grounds upon which he is entitled to relief. Id.

Harman's fraud claim currently does not allege the dates, time, places, or actors involved in the alleged fraudulent activity.  Furthermore, the claim does not describe the specific contents

of the fraudulent statements.  Therefore, the Court finds that Harman's fraud claims should have been plead with more particularity.  The Court, however, recognizes that when this action was filed Harman likely did not have access to the discovery necessary to inject allegations concerning the date, time, place, and actors involved in the alleged fraudulent activities.  Nevertheless, this matter has been pending for almost one year.  Accordingly, Harman should have access to the discovery necessary to supplement his fraud claims.  Harman is therefore directed to amend his fraud claim on or before August 30, 2007.  Specifically, Harman is advised that his amended fraud claim should describe the contents of the alleged fraudulent statements, as well as the dates, time, places, and actors involved in the alleged fraudulent activity.

### V.   CONCLUSION

For the reasons discussed above, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.      Defendant's Motion to Dismiss (DE 15) is **DENIED IN PART AND GRANTED IN PART**.

2.      Harman is directed to amend his fraud claim on or before **September 7, 2007**.  Harman is forewarned that failure to timely amend the fraud claim may result in its dismissal.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of August, 2007.

_Marcia G. Cooke_

MARCIA G. COOKE
United States District Judge

*Copies furnished to:*

*All Counsel of Record*

-14-